UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF NEW YORK

DAVID JAROSLAWICZ,

           Plaintiff,

   -against-

ADAM AMITAI,

           Defendant.

26-cv-05160-JSR

**AMENDED COMPLAINT**

Plaintiff DAVID JAROSLAWICZ, by his attorneys LAW OFFICE OF ELIZABETH EILENDER, P.C., alleges as against the defendant on information and belief, the following as his first amended complaint, served as a matter of course pursuant to Rule 15(a)(1)(B):

## THE PARTIES

1.     David Jaroslawicz ("Plaintiff") is a citizen of the State of New York.

2.     Adam Amitai ("Defendant") is a citizen of Israel.

3.     Defendant held himself out as the CEO of Lavaa Health (Exhibit A), an Israeli company supposedly involved in providing Artificial Intelligence ("AI") and related services to hospitals and medical health care providers (Exhibit B).

4.     Under the guise and ruse of seeking investment in an AI company, Defendant defrauded Plaintiff out of $250,000.

## JURISDICTION AND VENUE

5.     The amount in controversy exceeds the sum of $100,000, exclusive of interest and costs.

6.     Venue is properly placed in the State of New York since Plaintiff resides here, Defendant came here to perpetrate his fraudulent scheme, witnesses are located here, and this is the most convenient place for the trial of this action.

7.     Defendant directed Plaintiff to deposit funds in an HSBC Bank in upstate New York.

## AS AND FOR A CAUSE OF ACTION
### FRAUDULENT INDUCEMENT

8.      Defendant represented that Bernard Schayes, M.D., of the State and City of New York, Plaintiff's personal friend and physician, was one of the company's advisors.

9.      Through Dr. Schayes, Plaintiff was introduced to Defendant in New York.

10.     Defendant, an Israeli citizen, represented that he was the CEO of Lavaa Health (Exhibit A).

11.     Beginning in October 2024, having been introduced to Plaintiff, Defendant sought to obtain money from Plaintiff.

12.     Defendant represented to Plaintiff that he had a company in Lavaa Health that would use AI technology to streamline medical care and medical records (Exhibit B).

13.     Defendant also represented that Kesselman & Kesselman, a major accounting firm in Israel, were the auditors for the company (Exhibit C).

14.     In November 2024, Defendant sought to set up a conference call that included Plaintiff and an investor named Matthew A. Jacobson, whom defendant held out to be a principal of the company (Exhibit D).

15.     Defendant held a meeting with Dr. Shayes in New York on January 5, 2025, which Plaintiff did not attend. The next day, Defendant emailed Plaintiff to report that Plaintiff was being offered "the same exclusive terms that Matt Jacobson invested under: a $20M cap with a 20% discount. Matt committed $500K, joined us in an active role, and is already seeing the value of being part of our rapid growth." (Exhibit E).

16.     Defendant never specified what value Jacobson was allegedly seeing or what was growing rapidly.

17. Defendant then wrote of large numbers representing millions of dollars, stating: "For context, our last round was at a $12M valuation, and this round is effectively at $16M. With our A round planned at a $40M valuation in 2025, this is an incredible opportunity to join us at a significant inflection point." (Exhibit E).

18. Plaintiff spoke to Defendant on or about January 12, 2025.

19. In a follow up email, Defendant reiterated that Plaintiff would be investing with the "exact same terms that Matt Jacobson joined under" (Exhibit E).

20. With so much money allegedly committed by Jacobson, and Jacobson being actively part of the company, Plaintiff was given the impression that an investment in the company would be safe.

21. Based upon Defendant's representation of the company's alleged ongoing business with great potential, Jacobson's investment and participation, and Kesselman & Kesselman as the company's alleged auditors, Plaintiff agreed to invest $250,000.

**The Deleted Forum Selection Clause**

22. Defendant sent Plaintiff a proposed contract, which he called a "SAFE" agreement, and it contained a proposed forum selection clause at Section 6(h).

23. On January 13, 2025, Plaintiff signed the proposed SAFE agreement with modification: he rejected the proposed forum selection clause and indicated the rejection by crossing out the entire paragraph with a pen, and then placed his initials to identify who made the cross out.

24. Plaintiff then emailed the modified proposed contract to the defendant and drew attention to the change by stating in the email: "I cannot agree that some court in Tel Aviv/Yaffo will have exclusive jurisdiction if there is a problem. Please let me know if this is acceptable."

25.     In a reply email, Defendant agreed to the change, stating: "Thank you. I appreciate that and we can definitely handle section 6."

26.     Defendant also asked for the "full details of the investor name (you) to put in the title and will also be used for the future stocks" (Exhibit F).

27.     To that question, Plaintiff specified that title should be in his name and his wife's name, jointly (Exhibit F).

28.     On January 14, 2025, Defendant counter-signed the contract as modified and returned a fully executed agreement to Plaintiff; a copy of the signed agreement is annexed hereto as Exhibit G.

29.     At no time did the defendant notify Plaintiff that there was a plan to fold the venture without notice to Plaintiff at any time Defendant decided.

**Plaintiff Wires the Money**

30.     At Defendant's direction, on January 15, 2025, Plaintiff wired $250,000 to the account of Lavaa Health Inc. at HSBC Bank at 2929 Walden Ave., Depew, New York 14043, a bank approximately 350 miles from New York City (Exhibit H).

31.     As far as Plaintiff was led to believe, the purpose of wiring the $250,000 was to invest in Lavaa Ltd., a company with a similar name to Lavaa Health purportedly controlled by Defendant.

32.     Upon information and belief, the investment opportunity being touted by Defendant was a false pretense and part of an elaborate ruse by Defendant to defraud Plaintiff, whom the Defendant saw as a mark.

33.     Once Defendant received the money, Plaintiff did not hear from Defendant.

34.     After several months of silence, Plaintiff emailed Defendant on May 12, 2025, asking, "What, if anything, is happening with Lavaa?" (Exhibit I).

35.     Defendant responded: "Hi, what do you mean?" (Exhibit I).

36.     On January 29, 2026, Defendant sent Plaintiff an email referencing Lavaa, and stating that he "had secured an allocation of shares" that did not require any further investment, and wanted to "confirm" the name under which Plaintiff would like the shares to be held.

37.     Plaintiff responded to put the shares in his name and his wife's—as he had previously advised.

38.     Meanwhile, having scammed investors out of millions of dollars, Defendant secretly decided that not enough funds had been raised to make the Lavaa company work, took the money, closed up shop, and turned his attention to a different venture—leaving investors like Plaintiff with nothing.

39.     On March 12, 2026, apparently from out of the blue, a law firm emailed Plaintiff a DocuSign link with an email subject reference to Longview IQ Corporation, a company unknown to Plaintiff (Exhibit J).

40.     The next afternoon, a Friday, March 13, 2026, Defendant sent an email to Plaintiff reporting that Lavaa was not successful in "funding the next round."

41.     On Monday, March 16, 2026, Defendant emailed Plaintiff again, stating essentially that the company was out of business, and provided no explanation as to what happened to Plaintiff's $250,000 (Exhibit K).

42.     Up to today, Defendant has still failed to explain what happened to Plaintiff's money which was wired to an upstate New York bank account, and what other moneys were wired to that account as well.

43.     Attached to Defendant's March 16, 2026 email was an undated letter (Exhibit K) admitting that Lavaa was already out of business, and had been for an unspecified amount of time,

although it had only been about a year since Defendant had taken Plaintiff's money; needless to say, the money has disappeared.

44.    It appears that Defendant's attention and efforts had been focussed all along on an entirely new venture, Longview IQ, and he was using the same A.I. intellectual property for that endeavor that Defendant had used to separate Plaintiff from his money.

45.    Nothing in the email accounted for what happened to the millions of dollars of allegedly raised funds, including Plaintiff's $250,000 (Exhibit K).

46.    In the undated letter (sent 3/16/26), Defendant vaguely stated that: "Over the past period, the company has made substantial efforts to secure additional financing and to advance commercial opportunities. Unfortunately, despite these efforts, Lavaa has not been able to secure the funding necessary to continue its operations."

47.    The letter continued: "As of today, the company no longer has active clients, employees, or sufficient financial resources to sustain ongoing activities. In light of this situation, the company has begun taking the necessary steps to wind down its operations and proceed with an orderly shutdown in accordance with applicable corporate and legal requirements.... The company's management made significant efforts to develop the business and pursue funding opportunities; however, given the current financial condition of the company, continuing operations is not feasible." (Exhibit K).

48.    Suspiciously, Defendant did not specify what dates defined the "past period", what the repeatedly alleged "substantial efforts" entailed, or who made those efforts; when the employees left, or why, or what became of the pilot programs that had been touted as the basis of the U.S. American operations.

49. Defendant did not account for where the money went, what Jacobson, as the President of the company's operations, or anyone else had done to raise money, how much the "paid contractors" received in pay, who they were, what they were hired to do, what the rest of U.S. salesforce was doing to attract new clients, or why the pilot sites failed.

**Defendants's Story About Jacobson Changes**

50. On April 16, 2026, Plaintiff wrote to Jacobson, the purported President of the company (Exhibit L).

51. In response, Plaintiff received an email from Jacobson on April 17, 2026 (Exhibit M) who sought to justify his part in the fraud between him and Defendant, and possibly others unknown prior to discovery.

52. Jacobson sought to distance himself from Lavaa, admitting that he had held himself out as President of the company, but now claimed it was just a title and that he never had access to financial or other books and records.

53. Belatedly admitting that he was not the President of the company, Jacobson claimed he had only made unpaid efforts to generate business in the United States, had no role in corporate governance, and had no voting rights or involvement in fund-raising or financial management. Jacobson further revealed that he merely "wrote off" the loss of his $480,000, which is a large sum simply to discard without questioning what happened to it—unless something more was at play with Jacobson's money.

54. Jacobson thus confessed that the "sales operations" he allegedly directed on behalf of the company amounted to nothing more than his own "unpaid efforts" and the efforts of "short term paid contractors" to generate business in the U.S., and to implement Lavaa's technology at pilot sites.

55.    In other words, the success of the company, which allegedly failed for lack of funding, depended entirely on Jacobson, who according to Jacobson was not part of the company, not its President, and was not responsible for fundraising for the company or its financial management.

56.    The final disgraceful statement by Jacobson is the P.S. to his email which states: "I understand that Lavaa will be shutting down all servers including this email, therefore any future messages will most likely bounce back to you" (Exhibit M), in essence telling the Plaintiff not to bother chasing Defendant or Jacobson because they were disappearing in Israel or somewhere else in the world.

57.    In fact, an email sent to the general email address info@lavaa.health triggered a "Delivery Status Notification (Failure)" response (Exhibit N).

58.    Defendant never advised Plaintiff before obtaining his money in January 2025, that the reputable Israeli accounting firm Kesselman & Kesselman had withdrawn as the company's auditors in June 2024.

59.    The scheme was fraudulent and coordinated by Defendant who came to the United States to raise money and then abscond with it.

60.    Defendant fraudulently induced Plaintiff into wiring $250,000 as a purported investment in a company that was nothing more than a sophisticated shell and a sham designed and dressed up to look legitimate in order to defraud prospective investors.

61.    Defendant made false statements about the company's position and its ability to succeed.

62.    Defendant dangled its advanced A.I. proprietary technology and its application to the medical field, and promised Plaintiff "the same exclusive terms" that Jacobson had—and

Jacobson was the President of the company, no less—and that Jacobson invested nearly $500,000, and Jacobson was already seeing the value of being part of our rapid growth. (Exhibit E).

63.     The company did not have a real business providing A.I. and related services to hospitals and medical care practitioners, but claimed to have raised millions of dollars in the United States, but it was little more than a mechanism for Defendant to commit fraud.

64.     This did not stop Defendant from portraying himself on his Linked-In page as a major health care innovator and a saint on a mission, all part of the scam (Exhibit O).

65.     There was no active health care business; it was all a big lie.

66.     Defendant has refused to account for the money invested by Plaintiff.

67.     Plaintiff suspects Defendant put the money into the Defendant's personal account or pocket or used it to his own personal ends.

68.     By reason of Defendant's fraud, Plaintiff is entitled to recover all of his damages from Defendant, in the amount of $250,000 plus interest from January 16, 2025.

**WHEREFORE,** Plaintiff demands judgment against Defendant, to recover all of his damages in the amount of $250,000 plus interest from January 16, 2025, all together with the costs, punitive damages and disbursements of this action.

Dated: July 2, 2026

Yours,
LAW OFFICE OF ELIZABETH EILENDER, P.C.
*Attorneys for Plaintiff*

By: _____
       Elizabeth Eilender
225 Broadway, 24th Floor
New York, New York 10007
(212) 227-2780
eeilender@lawjaros.com

To:   **VIA ECF**
Samuel L. Blatnick, Esq.
BOCHNER PLLC
1040 Avenue of the Americas, 15th Floor
New York, NY 10018
sblatnick@bochner.law
*Attorneys for Defendant*